IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**03/30/2010**

```
                              )
IN RE                         )
                              )
RICHARD DAVIS,                )   CASE NO. 07-33986-H3-7
                              )
        Debtor,               )
                              )
WILLIAM G. WEST, TRUSTEE,     )
                              )
        Plaintiff,            )
v.                            )   ADV. NO. 09-3096
                              )
PHILIPPE TANGUY,              )
13,500 AIR EXPRESS, L.L.C.,   )
AND 13,500 AIR EXPRESS, L.P., )
                              )
        Defendants.           )
                              )
```

<u>MEMORANDUM OPINION</u>

        The court has held a trial in the above captioned adversary proceeding.  The following are the Findings of Fact and Conclusions of Law of the court.  A separate conforming Judgment will be entered.  To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such.  To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Findings of Fact</u>

        Richard Davis ("Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 12, 2007.  William G. West is the Chapter 7 Trustee.

Prior to January 5, 2006, Debtor owned and operated several businesses.  Among other businesses, Debtor operated Skydive Houston, a skydiving facility and school located in Waller, Texas.  Debtor also owned 13,500 Air Express, L.L.C., a Wyoming Limited Liability Company ("AXLLC").  AXLLC in turn owned a 1968 DeHavilland Twin Otter aircraft (the "Twin Otter"), and leased the Twin Otter to Skydive Houston for use in its skydiving operations.

On January 5, 2006, Debtor entered into a transaction with Philippe Tanguy.  There are two documents in evidence, both dated January 5, 2006, providing evidence of the transaction.[1] In the "13,500 Air Express, LLC and DeHavilland, Twin Otter N186AL, Purchase Agreement", Tanguy was identified as the buyer, and AXLLC as the seller, of the Twin Otter and the business of AXLLC.  The purchase agreement stated that the purchase price of $1,250,000, of which $12,500 was paid as a down payment, was to be by installment payment to begin on or before January 5, 2007. (Defendants' Exhibit 1).

Tanguy (on behalf of himself and AXLLC) executed a note, in the original principal amount of $1,237,500, payable to "FMS Co.," in 123 monthly installments of $10,000 each, and a

---

[1]Tanguy testified that there was a third document, a bill of sale, dated January 5, 2006, in a form recordable by the United States Federal Aviation Administration.  That document is not in evidence.

124th installment of $7,500 due on April 5, 2017 (the "Tanguy Note").  Although the Tanguy Note provided for zero interest on the unpaid principal balance, it provided for interest of ten percent per annum on delinquent payments.  (Trustee Exhibit 1).

Tanguy testified that he executed the Tanguy Note as the new owner of AXLLC.

After the transaction of January 5, 2006, in which Debtor sold to Tanguy his interest in AXLLC and the Twin Otter, Debtor continued to use the Twin Otter in the operations of Skydive Houston.

Tanguy testified that Debtor directed that Tanguy make payments under the Tanguy Note first to FMS Co., and then to DSGMD, LLC.  Tanguy testified that he paid approximately $280,000 to FMS Co., to DSGMD, and to Trustee, under the Tanguy Note.

Trustee testified that FMS Co. was an assumed name of Debtor.  Trustee testified that DSGMD, LLC was an entity controlled by Debtor's daughter, Patricia K. Suarez.

Checks for payments by Tanguy of $100,000 to DSGMD, LLC, and $90,000 to Trustee, are in evidence.  The first such check is dated May 10, 2007.  (Trustee Exhibit 6).  There are no other checks in evidence demonstrating additional payments on the Tanguy Note.

On July 26, 2007, in a suit filed by one David Laux, the 165th Judicial District Court of Harris County, Texas entered

3

a temporary restraining order, enjoining Tanguy from "selling, encumbering, transferring or relocating from the county in which 'Skydive Houston' operates" the Twin Otter.  (Defendants' Exhibit 5).  The restrictions set forth in the temporary restraining order were continued in a temporary injunction entered on August 16, 2007.  (Defendants' Exhibit 6).[2]

On September 27, 2007, although Debtor had filed the petition in the instant Chapter 7 case, and thus his interest had become property of the bankruptcy estate, Debtor purportedly assigned to JLE Investors, Inc. ("JLE") his interest in the Tanguy Note.  Attached to the copy of the purported assignment, admitted into evidence, is a copy of the Tanguy Note.  On the back, the note bears purported endorsements conveying the note from Debtor and/or AXLLC to DSGMD, dated April 1, 2007, conveying the note from DSGMD to Debtor on September 27, 2007, the date of the purported assignment to JLE, and purportedly conveying the Tanguy Note to JLE from both Debtor and DSGMD on that same date. (Trustee Exhibit 2).[3]

_____

[2]Neither the underlying pleadings which supported the issuance of the state court's temporary restraining order and temporary injunction, nor any records of the disposition of the state suit, are in evidence in the instant adversary proceeding.  Tanguy testified that he believes the injunction remains in effect.  He did not otherwise address the status of the state court suit.

[3]The court notes that the purported conveyances identify FMS Co. as an assumed name of Debtor.  The court finds that FMS Co. is an assumed name of Debtor.

4

When Trustee became aware of the purported assignment, he filed Adversary Proceeding No. 07-3496 against, <u>inter alia</u>, Debtor, Suarez, JLE, and JLE's principal James L. Emerson.

By order entered January 3, 2008, this court approved Trustee's compromise with JLE and Emerson.  The compromise, <u>inter alia</u>, called for JLE and Emerson to deliver to Trustee the Tanguy Note and all collateral under the note, including "the security agreement executed by Philippe Tanguy in connection with the Tanguy Note covering" the Twin Otter.  (Docket No. 81, Case No. 07-33986-H3-7).

JLE conveyed its interest in the Tanguy Note to Trustee, in an undated conveyance.  (Trustee Exhibit 4).  Trustee testified that he has the original Tanguy Note in his possession.

On April 10, 2008, in the instant Chapter 7 case, Trustee and Tanguy (both individually and in his capacity as general manager of AXLLC)[4] entered into a stipulation.  The stipulation provides that Trustee is the holder of the Tanguy Note, that the Tanguy Note is secured by a valid first priority lien in the Twin Otter, and that the Tanguy Note "is in full

---

[4]The stipulation bears a handwritten alteration showing that Tanguy was signing on behalf of 13,500 Air Express, L.P. rather than AXLLC.  Tanguy testified that, during 2007 or 2008, he converted the organizational form of AXLLC from a Wyoming Limited Liability Company to a Texas Limited Partnership.  For purposes of this opinion, 13,500 Air Express, L.P. is the same entity as AXLLC.  For convenience, this opinion continues to use the AXLLC abbreviation.

force and effect."  (Trustee Exhibit 5).

Tanguy testified that Trustee or his counsel made an
oral promise, in consideration for Tanguy's agreement to sign the
stipulation, that Trustee would defend Tanguy's title to the
aircraft.  The court finds this testimony not credible.

Todd Bell testified that, in March, 2008, he purchased
Skydive Houston.  Bell testified that he had been skydiving from
the Twin Otter since 2004, and bought Skydive Houston in 2008.
Bell testified that, when he bought Skydive Houston, he did a
title search, and determined that Tanguy or AXLLC was the owner
of the Twin Otter.  Nonetheless, Bell testified that Debtor, who
represented himself to be Tanguy's agent, directed that Skydive
Houston make payments for the lease of the Twin Otter to DSGMD.
Bell testified that, during the time he operated the Twin Otter
for Skydive Houston, the lease called for Skydive Houston to pay
$17 per skydiver to Tanguy.  Bell estimated that there were
20,000 skydivers during 2008.[5]

Bell testified that he expressed an interest in
purchasing the Twin Otter, during 2009.  He testified that, prior
to offering to purchase the Twin Otter, he contacted National
Aerotech, an inspector of aircraft licensed by the FAA, to

_____

[5]The court notes that there is no evidence as to whether
payments initially made by Skydive Houston to DSGMD were
forwarded to Tanguy.  There is also no evidence of whether
Skydive Houston made payments to anyone for use of the Twin Otter
prior to Bell's acquisition of Skydive Houston.

conduct a pre-purchase inspection of the aircraft.

Kevin Williams, an inspector with National Aerotech, testified that he performed the pre-purchase inspection during August, 2009.  He testified that he had been contacted by Bell regarding issues in the Twin Otter's electrical, hydraulic, and flight control systems.  He testified that he reviewed the portions of logbooks he was given.  He testified that flight logs were present, but that there were no logbooks as to the Twin Otter.

Williams testified that a DeHavilland Twin Otter requires logbooks for the airframe, each engine, each propeller. and flight logs of miles and hours flown.  He testified that logbooks identify the operator's performance of required maintenance, and compliance with airworthiness directives[6] of the FAA.  He testified that, for a DeHavilland Twin Otter, many of the parts are required to be replaced every five years.

Williams testified that, if logbooks are not present, it is not possible to verify that required maintenance has taken place, without disassembling each part of the plane, and

---

[6]Williams testified that airworthiness directives are issued by the Federal Aviation Administration, for airworthiness issues that have arisen in the past with respect to a particular model of aircraft.  He testified that, in response to an airworthiness directive, the operator must inspect the aircraft, and perform maintenance.  He testified that the official record of compliance with the FAA's airworthiness directives is maintained in the aircraft's logbooks.

examining it under ten times magnification. He testified that, in the absence of logbooks, the Twin Otter has a value of approximately $250,000, based on the value of the metal it contains. He testified that, with logbooks, the Twin Otter has a value of $900,000. He testified that, even if all logbooks were present, the Twin Otter would require approximately $300,000 in work, in order to implement airworthiness directives of the FAA, in order to make the Twin Otter airworthy.

Bell testified that, in response to the report prepared by Williams, he determined to ground the Twin Otter. He testified that the Twin Otter has remained grounded at Skydive Houston's facility in Waller, Texas since August, 2009.

Trustee testified that Defendants made no payments on the Tanguy Note after January, 2009. He testified that he received a letter, dated January 8, 2009 (Trustee's Exhibit 9), in which Defendants repudiated their obligations under the Tanguy Note.

Trustee presented a calculation of the balance due on the Tanguy Note based on the checks in Trustee Exhibit 6. Trustee calculated unpaid principal due of $1,047,500.00, interest through the date of repudiation of $7,594.52, and interest after the date of repudiation through December 14, 2009 (the date of trial) of $97,575.34. The interest accruing on the balance under the Tanguy Note is $286.99 per day. The court

8

finds that the balance due, as of the date of entry of the Judgment in the instant adversary proceeding, is $1,183,090.80. (Trustee Exhibit 10).

Trustee testified that a reasonable attorney fee for collection of the Tanguy Note is $31,180.75.

In the complaint in the instant adversary proceeding, Trustee seeks collection of the Tanguy Note, interest, attorney fees, and costs.  Defendants assert as affirmative defenses the absence of an indispensable party; equivalent value; equitable defenses of unclean hands and bad faith; fraud; ordinary course of business; non est factum; failure of consideration; offset; and reformation and/or rescission.[7]  Defendants counterclaim for breach of contract; tortious interference with property rights and prospective property rights and conspiracy to interfere. Trustee asserts as affirmative defenses to the counterclaim the failure to state a claim upon which relief can be granted; contributory negligence, estoppel, failure of consideration and fraud; and absolute immunity.

Conclusions of Law

A note is a negotiable instrument if it contains an unconditional promise to pay a fixed amount of money, with or

---

[7]The assertion of affirmative defenses for equivalent value and ordinary course of business appear to relate to a purported preference.  No preference complaint is before the court in the instant adversary proceeding.

9

without interest or other charges, if it is payable to bearer or to order at the time it is issued or first comes into possession of a holder; is payable on demand or at a definite time; and does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money.  Tex. Bus. & Comm. Code § 3.104(a).

To collect on a promissory note, the holder must establish that (1) there is a note; (2) he is the legal owner and holder of the note; (3) the defendant is the maker of the note; and (4) a certain balance is due and owing on the note. Blankenship v. Robins, 899 S.W.2d 236 (Tex. App.--Houston [14th Dist.] 1994, no writ).

There is no dispute regarding the existence of the note or its maker.  Rather, Defendants assert that Trustee is not the legal owner and holder of the note.  Trustee's evidence that he is the owner and holder of the note consists of the stipulation signed by Tanguy, Trustee Exhibit 5.

Whenever possible, courts should give effect to voluntary agreements freely made between the parties.  Johnson v. Swain, 787 S.W.2d 36 (Tex. 1989).  When parties stipulate to facts, these stipulations are binding upon the parties and the court.  M.J.R.'s Fare of Dallas, Inc. v. Permit and License Appeal Bd. of Dallas, 823 S.W.2d 327 (Tex.App.--Dallas 1991, writ den.).

10

In the instant case, Tanguy's testimony that the stipulation was given in consideration of Trustee's oral promise to support his position in state court is not credible.  The court notes that, although Trustee's counsel testified in state court, Trustee was not a party to the state court suit brought by Laux.  In addition, it is not plausible that Trustee would have promised to support Tanguy's position, in light of the continued use of the plane by Skydive Houston, an entity then controlled by Debtor.  The court concludes that the stipulation of Tanguy that Trustee is the owner and holder of the note is enforceable.

When a party who is obligated to make future payments of money to another absolutely repudiates the obligation without just excuse, the obligee is entitled to maintain his action for damages at once for the entire breach, and is entitled in one suit to receive in damages the present value of the future payments payable to him by virtue of the contract.  Taylor Pub Co. v. Systems Marketing, Inc., 686 S.W.2d 213 (Tex. App.--Dallas 1984, writ ref'd n.r.e.).

In the instant case, Defendants repudiated the Tanguy Note in January, 2009.  The Tanguy Note provided for 10 percent interest on unpaid balances.  The court concludes that Defendants are liable to Trustee on the Tanguy Note, in the amount of $1,161,566.55.

As to attorney fees, Trustee asserts that attorney fees are recoverable under Section 38.001 of the Texas Civil Practice & Remedies Code.

Under Texas law, recovery of attorney fees is not allowed unless authorized by statute or by contract.  Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299 (Tex. 2006).

Section 38.001 of the Texas Civil Practice & Remedies Code provides that a person may recover reasonable attorney's fees if the claim is for:

(1)  rendered services;
(2)  performed labor;
(3)  furnished material;
(4)  freight or express overcharges;
(5)  lost or damaged freight or express;
(6)  killed or injured stock;
(7)  a sworn account; or
(8)  an oral or written contract.

Tex. Civ. Prac. & Rem. Code § 38.001.

In the instant case, the suit on a note is a suit on a written contract.  Thus, attorney fees are recoverable under Tex. Civ. Prac. & Rem. Code § 38.001.  The court concludes that Defendants are liable to Trustee in the amount of $31,180.75 for attorney fees.

Defendants assert that Laux and JLE are indispensable parties, because Laux and/or JLE acted as Trustee's agents. Defendants presented no credible evidence showing an agency relationship between Trustee and either Laux or JLE.

12

Defendants assert unclean hands and bad faith, and fraud on the part of Trustee.  Defendants presented no credible evidence showing unclean hands or bad faith on the part of Trustee.

Defendants' assertion of receipt of reasonably equivalent value, and ordinary course of business, which would be responsive to a preference complaint, have no application to the suit on a note in the instant adversary proceeding.

The defense of "non est factum" denies the execution of an instrument sued on.  Black's Law Dictionary 1079-1080 (8th Ed. 2004).  In the instant case, Tanguy testified that he executed the note.  That testimony is sufficient to negate the defense of non est factum.

Defendants assert as a defense that any claim by Trustee to a secured interest in the Twin Otter fails for want of consideration.  Although Trustee has asserted in the complaint that the note is secured by the Twin Otter, Trustee has not sought in the instant adversary proceeding to recover the Twin Otter or its value.

Defendants' asserted defenses for offset, reformation and/or rescission depend on Defendants' assertion that Laux was Trustee's agent.  Defendants presented no credible evidence showing an agency relationship between Trustee and Laux.  Moreover, as to Defendants' assertion that Debtor breached a

13

warranty that the Twin Otter was in good condition, and that
Debtor's breach is imputed to Trustee, the Twin Otter was used in
skydiving operations, after the sale, from January 2006 through
August, 2009.  The court finds credible the testimony of Williams
that certain parts of a Twin Otter require replacement every five
years.  The court finds that Tanguy took possession of the Twin
Otter.  Defendants presented no evidence that Debtor concealed
the Twin Otter's logbooks from Tanguy.  Instead, more than two
years after Tanguy had purchased the Twin Otter, and after he had
been sued by Laux, Tanguy learned, because of efforts on the part
of Bell to exercise due diligence before buying the Twin Otter,
that complete logbooks were not available.  Moreover, the court
finds that Defendants failed to present any evidence as to the
value of the Twin Otter at the time of execution of the Purchase
Agreement, and whether such value took into consideration the
absence of logbooks.  The court finds the connection between the
absence of logbooks during late 2008 and any warranty too tenuous
to support a finding of a failure of consideration for the sale.

On Defendants' counterclaim, they assert that Laux
and/or JLE engaged in wrongful acts, for which Trustee is liable
by reason of ratification.  Defendants presented no evidence of
wrongful acts of Laux and/or JLE.  Defendants presented no
evidence that Laux or JLE was Trustee's agent.  Defendants
presented no evidence of tortious interference or conspiracy by

14

Trustee.  The court concludes that Trustee is not liable to Defendants on the theories Defendants pled in their counterclaim.

Based on the foregoing, the court will enter a separate Judgment in favor of Trustee, against Defendants, jointly and severally, in the amount of $1,183,090.80 for principal and interest, plus $31,180.75 for attorney fees.

Signed at Houston, Texas on March 30, 2010.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE

15